

## NUMBER 13-10-569-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

**DERLAND ONEAL SANFORD,**                                                      **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                          **Appellee.**

### On appeal from the 24th District Court
### of Jackson County, Texas.

## MEMORANDUM OPINION

### Before Justices Benavides, Vela, and Perkes
### Memorandum Opinion by Justice Vela

Appellant, Derland ONeal Sanford, pleaded guilty to aggravated sexual assault of

a child under the age of fourteen, *see* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (2)(B)

(West Supp. 2010), and was placed on deferred-adjudication community supervision for

ten years, plus a $3,000 fine.   Thereafter, the State filed a petition for revocation and final

adjudication, alleging appellant violated the terms and conditions of his community supervision by: (1) committing a new offense, i.e., sexual assault; (2) failing to pay court costs and monthly community-supervision fees; (3) failing to complete community-service hours; and (4) violating curfew.

Appellant pleaded "not true" to the allegations, and following a revocation hearing, the trial court revoked community supervision, adjudicated him guilty of the original offense, and assessed punishment at twenty-five years' imprisonment, plus a $5,000 fine. By one issue, appellant argues that the trial court erred by not allowing defense counsel to cross-examine the complaining witness ("A.P.") about other sexual partners she may have had on or near the date of her alleged sexual assault. We affirm.

## I. REVOCATION HEARING

### A. State's Evidence

The following evidence relates to the State's petition for revocation, which includes a new offense of sexual assault in which A.P. was the victim. A.P. and appellant had a sexual relationship with each other that ended on September 26, 2009. On that day, appellant came into A.P.'s room and accused her of "sleeping with" her brother's friend. Appellant grabbed her by the hair, pulled her out of bed, and punched her on her back. Afterwards, A.P. told appellant she did not want to have anything more to do with him sexually or romantically.

On October 20, 2009, appellant came to A.P.'s house and asked her if they "could sleep together one last time . . . ." She told him, "no," and testified that after this request, she and appellant were "okay with one another." On the morning of November 1, she

2

asked appellant if she could pick up some meat.[1]  He told her he could not give it to her at that time, and she told him to take the meat to her brother's house.  Late that night, appellant came to A.P.'s house to deliver the meat.  She let him in the house and put the meat in the freezer.  He sat on the love seat, and she sat on the couch.  After they watched TV, he got on top of her and held her arms above her head.  She told him to stop and tried to push him off.  Undaunted, he pulled down her shorts and panties and penetrated her with his sexual organ.  When the prosecutor asked her, "Did it hurt, [A.P.]?," she said, "Yes, because I didn't want it."  After he finished assaulting her, she went into her room and locked the door.  Two days later, she reported the incident to the police.

Candace Alcalais, a friend of both A.P. and appellant, testified that in the morning following the incident, A.P. called her to discuss "what [appellant] had done to her [A.P.] . . . ."  When the prosecutor asked Alcalais, "Did she [A.P.] use the words that he had raped her?," she said, "Yes, sir."

During the day and night following the incident, Alcalais talked to appellant several times over the telephone.  When the prosecutor asked her, "[D]id he admit to you that [A.P.] had told him no?," she said, "Yes, sir.  His exact words were [A.P.] had told him no, but he did not believe her."

Jennifer Mumphord, a sexual assault nurse examiner, testified that "law enforcement" advised her "[t]hat there was a sexual assault that had happened to" A.P.  On November 4, 2009, Mumphord took A.P.'s medical history and examined her for evidence of sexual assault.  When the prosecutor asked Mumphord, "[D]id she [A.P.] tell

[1] A.P.'s friend had given the meat to appellant, and he was supposed to give the meat to A.P.

3

you that this was a nonconsensual sex that . . . [appellant] had with her?," she said, "Yes." Mumphord found "notches" on the internal tissues of A.P.'s sexual organ and bruising "on the inside of the body[.]" She testified the notches and bruising would be "more consistent with . . . nonconsensual" sex. Mumphord did not know how long the notches and bruising had been there. She also stated that notches are not always caused by nonconsensual sex and that bruising can occur from consensual sex or from "no sex whatsoever[.]" However, when the prosecutor asked her, "From your past training and experience, were those notches, the condition of them, and that bruising in the color and configuration that you saw it consistent with an injury/sexual assault that had occurred two-and-a-half to three days earlier?," she said, "It definitely could be."

Jody Hickl, an adult probation officer, testified the terms and conditions of appellant's community supervision required him to: (1) observe a 10:00 p.m. to 5:00 a.m. curfew; (2) pay $653 in court costs; (3) pay a sixty dollar per month supervisory fee for the entire probationary period; (4) perform seventeen hours of community-service restitution per month, beginning July 30, 2009; and (5) violate no laws of the State of Texas. He testified appellant owed sixty-seven dollars in past-due court costs and owed sixty dollars in past-due probation fees. He stated appellant had only performed nineteen of the required fifty-one hours of community-service restitution.

## B. Defense Evidence

Appellant's father, Rodney Sanford, testified that around 8:00 p.m. on November 1, 2009, appellant "was on the way from Navasota from a rodeo and . . . I called him and asked him to bring me a case of water home." Appellant arrived at his father's house

about 8:20 p.m., and after dropping off the water, appellant went to his paternal grandfather's house to put away the horses. Sanford was "not quite sure" where appellant went after that.

Appellant's mother, Mechealinda Sanford, testified that after appellant's arrest, A.P. "contacted" her "several times[.]" She stated that A.P. had attended Sanford family gatherings and events without being invited. She did not know A.P. prior to appellant's arrest.

A.P. testified that when she went to appellant's house to return a chain she had borrowed, appellant admitted to her he had "done coke the night before." Appellant still had some left, and he asked her to "do it with him." A.P. testified that during one of her contacts with appellant's mother, A.P. told her that "I had forgiven him [appellant] and I didn't want to go with it."

Appellant did not testify during the adjudication phase of the hearing. After hearing the testimony and closing arguments, the trial court stated, in relevant part:

> The Court finds based on a preponderance of the evidence that Paragraph 1 is true; that is, that a sexual assault occurred on or about the second day of November, 2009 in Wharton County, and the Court finds that Paragraph 2 is true, that the Defendant violated the term of his probation that required him to respond to a curfew from 10:00 p.m. to 5:00 a.m. on or about the second day of November, 2009.
>
> The Court finds that Paragraph 3 was not proved to the satisfaction of the Court and is therefore not true. The Court finds that Paragraph 4 was not proved to the satisfaction of the Court and therefore is not true. The Court finds that Paragraph 5 is true, that the Defendant failed to perform the community service restitution hours that were required under his probationary order.

5

The trial court revoked appellant's community supervision and adjudicated him guilty of aggravated sexual assault of a child under fourteen years of age.

## II. DISCUSSION

By a single issue, appellant contends the trial court erred by not allowing defense counsel to cross-examine the complaining witness, A.P., about other sexual partners she may have had on or near the date that he allegedly sexually assaulted her. Appellant directs us to two separate instances during the adjudication phase where the trial court restricted defense counsel's cross-examination of A.P.

In the first instance, defense counsel asked A.P., "So who lived with you on the 26th of September in your house?" To this, A.P. replied, "Me, my husband and my two kids." Next, defense counsel asked her, "Weren't you seeing other people besides your husband?" Before A.P. could answer the question, the prosecutor objected, in relevant part, that the question was "simply a way to circumvent the rape shield law,[2] which is not permissible." In reply, the trial court stated, "Objection overruled[,]" and defense counsel asked A.P., "[H]ow many people were you seeing September 26, 2009?" At this point, the prosecutor asked the trial court, "Did the Court rule that [defense counsel] can go into prior sexual relationships?" The trial court stated, "No. I sustained your objection." At that point, defense counsel remarked, "Seeing doesn't mean sex. I'm asking her how many people was she seeing." After defense counsel made this comment, A.P. stated, "I wasn't seeing anybody."[3] In response, defense counsel said, "She answered the question."

---

[2] *See* TEX. R. EVID. 412.
[3] The prosecutor did not object to A.P.'s answer.

In *Martinez v. State*, defense counsel asked the defendant "whether, 'during the course of the commission of this crime,' he knew that what he was doing was wrong. . . ." 723 S.W.2d 264, 265 (Tex. App.—San Antonio 1986, pet. ref'd). After the trial court sustained the State's objection to this question, defense counsel, without any objections from the State, posed "similar questions" to the defendant. *Id.* The defendant answered that "at the time of the crime he was not aware that his actions were 'bad.'" *Id.* When defense counsel asked the defendant whether he knew his actions at the time were right or wrong, he said, "'I don't know nothing at all of what happened.'" *Id.* On appeal, the defendant argued the trial court erred by not allowing him to present evidence of temporary insanity due to intoxication. *Id.* The appellate court held that "[s]ince similar questions were asked and answered without objection, the court's error in sustaining the State's objection, if any, was harmless." *Id.* at 265–66.

Here, after the trial court sustained the State's objection to defense counsel's question about whether A.P. was seeing other people besides her husband, defense counsel continued this line of questioning by stating, "Seeing doesn't mean sex. I'm asking her [A.P.] how many people was she seeing." After defense counsel said this, A.P. replied, "I wasn't seeing anybody." Because defense counsel's question, which was similar to the question objected to by the State, was asked and answered without objection, any error the trial court may have made by sustaining the objection is harmless. *See Martinez*, 723 S.W.2d at 265–66; *see Williams v. State*, 566 S.W.2d 919 (Tex. Crim. App. 1978).

7

In the second instance, defense counsel interrogated A.P. about what she did immediately after appellant sexually assaulted her. After finishing that line of questioning, defense counsel asked A.P., "Had you had sex with anyone else during that time?" At that point, the prosecutor stated, "Your Honor—." However, A.P. interrupted the prosecutor by saying, "No." After A.P. answered the question, the prosecutor stated, "Hold on. That's exactly a violation of the rape shield." The trial court sustained the objection.

Texas Rule of Evidence 103(a)(2) limits the scope of issues which may be appealed when evidence is limited or excluded. In other words, "[e]rror may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected, and . . . the substance of the evidence was made known to the court by offer, or was apparent from the context within which questions were asked." TEX. R. EVID. 103(a)(2). The offer of proof may be in question-and-answer form or in the form of a concise statement by counsel. TEX. R. EVID. 103(b); *Warner v. State*, 969 S.W.2d 1, 2 (Tex. Crim. App. 1998). "An offer of proof to be accomplished by counsel's concise statement must include a reasonably specific summary of the evidence offered and must state the relevance of the evidence unless the relevance is apparent, so that the court can determine whether the evidence is relevant and admissible." *Warner*, 969 S.W.2d at 2. The primary purpose of an offer of proof is to enable us to determine whether the exclusion was erroneous and harmful. MCCORMICK ON EVIDENCE § 51 (4th ed. 1992); *accord*, Steven Goode et al., 1 TEXAS PRACTICE GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 103.3 (1993).

8

Here, the substance of the evidence was not made known to the trial court by offer. In addition, the substance of the evidence was not apparent from the context within which questions were asked. Because the substance of the evidence was not made known to the trial court by offer, and because the substance of the evidence was not apparent from the context within which questions were asked, appellant has failed to comply with Rule 103(a)(2). Thus, we hold that appellant waived any error with respect to the trial court's exclusion of A.P.'s testimony about whether she had sex with anyone else after appellant had sexually assaulted her. *See* TEX. R. EVID. 103(a)(2); *Guidry v. State*, 9 S.W.3d 133, 153 (Tex. Crim. App. 1999) (holding that defendant's argument regarding exclusion of evidence was waived because defendant did not make an offer of proof regarding excluded testimony).

Moreover, a revocation of community supervision is reviewed for an abuse of discretion. *Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006). The State's burden of proof during a revocation hearing is a preponderance of the evidence. *Id.* at 763–64. This burden is satisfied when the greater weight of the credible evidence creates a reasonable belief that the defendant violated a condition of community supervision. *Id.* at 764.

In this case, even if we assume that the trial court committed reversible error by restricting defense counsel's cross-examination of A.P., appellant does not challenge the sufficiency of the evidence to support the trial court's determination that he committed two other violations of the terms and conditions of his community supervision. "Proof by a preponderance of the evidence of any one of the alleged violations of the conditions of

9

community supervision is sufficient to support a revocation order." *Leach v. State*, 170 S.W.3d 669, 672 (Tex. App.—Fort Worth 2005, pet. ref'd) (citing *Moore v. State*, 605 S.W.2d 924, 926 (Tex. Crim. App. 1980); *Sanchez v. State*, 603 S.W.2d 869, 871 (Tex. Crim. App. 1980)). Therefore, appellant has failed to show that the trial court abused its discretion by revoking his community supervision. *See Cardona v. State*, 665 S.W.2d 492, 493–94 (Tex. Crim. App. 1984). The sole issue for review is overruled.

### III. CONCLUSION

We affirm the trial court's judgment.


ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
18th day of August, 2011.