**Opinion issued August 9, 2012**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-10-01133-CR

_____

**MACEO JERATE DOWNEY AKA MACEO JERARD DOWNEY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 122nd District Court
Galveston County, Texas
Trial Court Case No. 10CR0678

## MEMORANDUM OPINION

Maceo Jerate Downey AKA Maceo Jerard Downey was convicted by a jury of unlawful possession of a firearm by a felon and, after finding two enhancement paragraphs to be true, the trial judge assessed Downey's punishment at twenty-five

years' confinement. In his first two points of error, Downey argues that the evidence is insufficient to prove (1) that he knowingly possessed the firearm and (2) that he possessed the firearm "on the streets of the City of Dickinson, Texas," as alleged in the indictment and the jury charge. Downey's third point argues that the trial court erred in refusing to grant a mistrial for improper jury argument by the State.

We affirm.

## Background

As part of a larger operation involving five or six undercover officers,[1] the Galveston County Sheriff's Office set-up an undercover deputy to buy an ounce of cocaine from Brandon Ash at an apartment complex in Dickinson, Texas. The undercover deputy was inside the apartment, and the other deputies were sitting in a car across the street, outside a daycare center, waiting for Ash to deliver the cocaine. Ash arrived late in the evening and went upstairs to the apartment where the undercover deputy was waiting. Once the other deputies heard the code word that the buy was complete, they drove across the street into the apartment complex's parking lot.

As he entered the parking lot, Sergeant Michael Barry, the supervising deputy, saw a man wearing a dark colored or gray hoodie, blue jeans, and white

---

[1] The details of the larger operation were testified to at trial but are not pertinent to this appeal.

2

tennis shoes standing next to Ash's vehicle. The deputies had not expected anyone to be with Ash. Barry ordered the other deputies to help the undercover deputy so he could tend to the man next to Ash's vehicle. Barry, who wore a black tactical vest that said "Sheriff" on the front and the back, got out of his car, drew his weapon, walked up to the man, and told him to go to the back of the vehicle and put his hands on the car. Although he hesitated, the man complied with Barry's orders. Barry testified that the man also made several movements that concerned him. Specifically, the man dropped his right hand down towards his waist twice, and he told Barry that he had not done anything. After the second time the man dropped his right hand, Barry pushed him against the car, holstered his weapon, and attempted to handcuff him, but the man broke free and ran. After initiating a chase, Barry quickly realized that he would not be able to catch the man, and he stopped his pursuit.

Sergeant Barry then saw the man stop, drop his right arm, and turn his body toward Barry. Based on his past experiences, Barry thought that the man was reaching for a gun, even though he did not see one. Feeling threatened, Barry pulled his own gun and fired one shot. He was not sure whether he hit the man. After he fired the shot, he saw the man run about thirty yards towards the daycare center across the street, cut across a ditch, cross the road, and run into a dark field next to the center.

3

About forty minutes later, Downey, shirtless but wearing white tennis shoes and blue jeans, was found within about two blocks of the apartment complex bleeding from a gunshot wound to his left ankle.

Officers also found a gray hoodie turned inside out, a blue shirt, and a belt in the field next to the daycare center that night. The following afternoon, a more thorough search found a gun inside a white sock twenty-five to thirty yards from the daycare center's parking lot. A forensic investigator with the Sheriff's Office took custody of the sock and gun, and, after officers read him his rights, another forensic investigator collected a DNA sample from Downey.

The State introduced into evidence an aerial Google map of the area of the shooting, and the forensic investigators marked on the map where the gray hoodie, blue shirt, belt, and Downey were found. The forensic investigator who collected the gun and sock testified that he made no attempt to collect fingerprints from the gun or otherwise process it because his department was involved in the shooting. Rather, he forwarded both the gun and the sock to the Department of Public Safety crime lab for analysis. He noted that fingerprints are fragile and generally not found on firearms. He further noted that, because the gun was inside a sock and could rub up against the sock, any fingerprints on the firearm could have been smudged or wiped off entirely.

A forensic scientist from the DPS crime lab testified that when she received the sock it was inside out and there was a gun inside it. She swabbed both the gun and the inside of the sock. Another crime lab forensic scientist testified that his test of the swabs determined that Downey was the major contributor of DNA on the sock containing the gun. He noted there was also a minor contributor of DNA on the sock and, although he was able to rule out Barry as the minor contributor, he was unable to identify the donor. He was not surprised that there was DNA on the sock, but not on the gun, due to the possibility that DNA on the gun would be wiped off inside a sock.

**Sufficiency of the Evidence**

Downey's first and second points of error challenge the sufficiency of the evidence to support his conviction.

We review challenges to the legal sufficiency of the evidence under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 318–20, 99 S. Ct. 2781, 2788–89 (1979). *See Ervin v. State*, 331 S.W.3d 49, 52–56 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 894–913 (Tex. Crim. App. 2010)). Under the *Jackson* standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational fact-finder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S.

5

at 317–19, 99 S. Ct. at 2788–89; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). Evidence is insufficient under this standard in four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; and (4) the acts alleged do not constitute the criminal offense charged. *See Jackson*, 443 U.S. at 314, 318 & n.11, 320, 99 S. Ct. at 2786, 2789 & n.11; *Laster*, 275 S.W.3d at 518; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The *Jackson* standard gives full play to the responsibility of the fact-finder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 318–19, 99 S. Ct. at 2788–89; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

An appellate court's determination as to whether the necessary inferences are reasonable is based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clayton*, 235 S.W.3d at 778 (citing *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007)). In viewing the record, direct and circumstantial evidence are treated equally. *Id.* Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Id.* An appellate court presumes that the fact-finder resolved any conflicting

6

inferences in favor of the verdict and defers to that resolution. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778. We also defer to the fact-finder's evaluation of the credibility and weight of the evidence. *See Williams*, 235 S.W.3d at 750. If we find the evidence insufficient under this standard, we must reverse the judgment and render an order of acquittal. *See Tibbs v. Florida*, 457 U.S. 31, 42, 102 S. Ct. 2211, 2218 (1982).

### a. Insufficient Links to Firearm

Downey's first point contends that there was no direct evidence linking him to the firearm. Specifically, he argues that the evidence was insufficient because the discovery of his DNA on the sock did not prove that he knowingly possessed the firearm found inside the sock.

He notes that the firearm was never tested for fingerprints, no DNA evidence was found on the firearm, and, although Barry testified that, based on his prior experiences and the man's behavior, he thought that the man who fled from him had a firearm, Barry never saw a firearm. Downey also argues that, although his DNA was found on the sock in which the firearm was found, along with the DNA from another unknown person, there is no evidence that he was in possession of the sock while the gun was inside it, which he argues, is the only type of possession that would support a conviction. Moreover, no one ever saw the sock in Downey's hand or on his person, and he was wearing a different type of sock when he was

taken into custody. Downey argues that, at most, there was some evidence that he had possession of the sock at some point, but not enough to say that he had possession of the sock during the pertinent time period—when the firearm was inside the sock.

To establish unlawful possession of a firearm by a felon, the State must show that the accused was previously convicted of a felony offense and after conviction and before the fifth anniversary of his release from confinement, community supervision, parole, or mandatory supervision following the felony conviction, whichever date is later, the accused was in possession of a firearm at location other than premises at which he lived. TEX. PENAL CODE ANN. § 46.04(a)(1), (2) (West 2011). Possession is a voluntary act if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control. TEX. PENAL CODE ANN. § 6.01(b) (West 2011); *see Williams v. State*, 313 S.W.3d 393, 397 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd); *James v. State*, 264 S.W.3d 215, 218 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd).

If the firearm is not found on the defendant or is not in his exclusive possession, the evidence must link him to the firearm. *See Evans v. State*, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006); *Williams*, 313 S.W.3d at 397; *James*, 264 S.W.3d at 218–19. The evidence must establish that the defendant's

8

connection with the contraband was more than fortuitous. *Evans*, 202 S.W.3d at 161. Among the many possible factors that we may consider to decide whether there is an affirmative link between the defendant and the contraband are whether: (1) the defendant was in close proximity and had ready access to the contraband; (2) conduct by the defendant indicated a consciousness of guilt, including extreme nervousness or furtive gestures; (3) the defendant attempted to flee; (4) affirmative statements connect the defendant to the contraband, including incriminating statements made by the defendant when arrested; and whether (5) any forensic evidence (e.g., fingerprints, DNA, etc.) connects the defendant to the contraband or its container. *See Williams*, 313 S.W.3d at 397–98; *see also James*, 264 S.W.3d at 219; *Triplett v. State*, 292 S.W.3d 205, 208 (Tex. App.—Amarillo 2009, pet. ref'd). It is not the number of links that is dispositive, but rather the logical force of all of the evidence, direct or circumstantial. *Evans*, 202 S.W.3d at 162. The absence of various links does not constitute evidence of innocence to be weighed against the links present. *James*, 264 S.W.3d at 219.

Downey's conduct in the parking lot indicates a consciousness of guilt and affirmatively links him to the gun. When Sergeant Barry approached him in the parking lot, Downey did not immediately comply with Barry's orders to go the back of the vehicle, nor did he keep his hands on the vehicle as instructed. He dropped his right hand down by his waistband twice, as if reaching for a firearm.

9

Barry testified that it is not uncommon for people to bring guns to drug deals and that it is common for people to keep a gun in their waistband or in a pocket. When Barry attempted to handcuff him, Downey he broke free and ran off; those actions are consistent with someone's knowingly carrying contraband. *See Figueroa v. State*, 250 S.W.3d 490, 503 (Tex. App.—Austin 2008, pet. ref'd) (stating attempts to flee police can be used to infer consciousness of guilt); *Corpus v. State*, 30 S.W.3d 35, 38 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (finding that defendant's furtive gestures supported inference of guilt).

Downey's subsequent conduct, including evidence of his attempt to conceal the gun by throwing it into the field and his attempt to alter his appearance, also indicates a consciousness of guilt and affirmatively links him to the gun. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (concluding that "[a]ttempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt"); *Tezino v. State*, 765 S.W.2d 482, 485 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd) (stating that concealment of pertinent evidence supports inference of guilt).

That fact that Downey's DNA was found on the inside of the sock containing the firearm is yet another affirmative link tying Downey to the contraband because it tends to show that he knowingly possessed the firearm and

10

that his connection with the firearm was more than fortuitous. *See Triplett*, 292 S.W.3d at 208–09 (stating forensic evidence that connects defendant to contraband or its container is affirmative link). Downey attempts to minimize this fact by arguing that there could have been contamination at the crime lab and suggesting that the firearm might even have been planted. Downey's trial counsel raised both of these issues at trial. When questioned by Downey's trial counsel about the possibility of contamination, the forensic scientist said the crime lab takes great measures to avoid contamination and that contamination is very rare. She also testified that the sock could have rubbed up against the gun and removed the DNA from the gun. As the fact-finder, the jury was in the best position to weigh the testimony, and consider all of the evidence, including the evidence supporting the Downey's contamination and evidence-planting theories. We resolve any conflict in favor of the jury's verdict. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

Viewing the evidence in the light most favorable to the verdict, we conclude that the logical force of the evidence links Downey to the firearm. We further conclude that the jury could reasonably have found that Downey ran through the field across the road from the apartment complex where the cocaine buy occurred, with a gunshot wound to his foot from Sergeant Barry's gun, and discarded clothes

11

and a gun as he ran, because he was a felon in possession of a firearm and he was trying to distance himself from the firearm he was carrying in a sock.

We overrule Downey's first point of error.

### b. Possession at Location Stated in Indictment

In his second point of error, Downey alleges that the evidence was insufficient because he was not shown to have possessed the firearm "on the streets of the City of Dickinson, Texas," as stated in the indictment and the jury charge.

As previously discussed, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational fact-finder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 317, 318–19, 99 S. Ct. at 2788–89; *Laster*, 275 S.W.3d at 517. It is the responsibility of the fact-finder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 318–19, 99 S. Ct. at 2788–89; *Clayton*, 235 S.W.3d at 778. We defer to the jury's determinations of the witnesses' credibility and the weight to be given their testimony. *See Williams*, 235 S.W.3d at 750.

Sergeant Barry testified that, after he tried to handcuff Downey, Downey "ran for 30 yards or so. He cut across a ditch and went across the road towards the day care where we originally were, and I lost visual once he went into a grassy

12

area." The State asked, "When you say he ran, did he run on the streets of the City of Dickinson?" Barry responded, "Yes, he did."[2] Barry's testimony is some evidence that Downey possessed a firearm at the location alleged in the indictment and jury charge. The jury was within its province as the fact-finder to believe and give weight to Barry's testimony, and we must defer to those determinations. *See Williams*, 235 S.W.3d at 750. Viewing the evidence in the light most favorable to the verdict and giving proper deference to the fact-finder, we conclude that the evidence is sufficient to prove that Downey possessed a firearm on the "streets of the City of Dickinson, Texas."

We overrule Downey's second point of error.

## Jury Argument

In his third point of error, Downey argues that the trial court erred when it refused to grant a mistrial after the State made an improper remark during closing argument. Downey argues that the prosecutor implied through sarcasm that he was involved in the narcotics transaction, and that the jurors could have taken the comments as a suggestion by the State that there were additional facts which had not been brought out in the testimony.

---

[2] Although Downey contends that the testimony only came about as the result of a leading question, he did not object at trial. Therefore, no error was preserved. *See* TEX. R. EVID. 103; TEX. R. APP. P. 33.1(a); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (stating that when conducting sufficiency review, appellate courts consider all admitted evidence).

13

The State argued in its closing argument, in pertinent part:

Here is what the case boils down to: Either Maceo Downey is the man that threw the gun in the field, or he is the unluckiest defendant that has ever stepped foot in a courtroom. He goes to a drug deal he knows about [sic] nothing about, happens to be a large drug deal —

MR. SMITH: Objection, no evidence in the record of that, Your Honor.

THE COURT: I sustain that. Again, I will remind you that the evidence is what you heard from the witnesses and not what the lawyers say is the evidence. You may proceed.

MR. SMITH: Move for mistrial, Your Honor.

THE COURT: Denied.

Proper jury argument falls within one of the following categories: (1) summation of the evidence; (2) reasonable deduction drawn from the evidence; (3) answer to argument of opposing counsel; and (4) a plea for law enforcement. *Davis v. State*, 329 S.W.3d 798, 821 (Tex. Crim. App. 2010). Counsel is allowed wide latitude without limitation in drawing inferences from the evidence so long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988).

Error exists when facts not supported by the record are interjected into the argument, but such error is not reversible unless, in light of the record, the argument is extreme or manifestly improper. *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App. 2000); *Allridge v. State*, 762 S.W.2d 146, 155 (Tex. Crim. App. 1988). However, because the trial court sustained Downey's objection and

14

instructed the jury to disregard the argument, "[t]he only adverse ruling—and thus the only occasion for making a mistake—was the trial court's denial of the motion for mistrial." *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004). Thus, "the proper issue is whether the refusal to grant the mistrial was an abuse of discretion." *Id.* at 77. We "must uphold the trial court's ruling if that ruling was within the zone of reasonable disagreement." *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004).

When evaluating whether the trial court abused its discretion in denying a mistrial for improper jury argument, appellate courts must balance: (1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge), and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *See Archie v. State*, 340 S.W.3d 734, 739 (Tex. Crim. App. 2011); *Hawkins*, 135 S.W.3d at 77 (adopting three factors from *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998)). "Mistrial is the appropriate remedy when . . . the objectionable events 'are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant.'" *Archie*, 340 S.W.3d at 739 (quoting *Young v. State*, 137 S.W.3d 65, 71 (Tex. Crim. App. 2004)).

Even assuming that the State's closing argument was improper, we cannot say, based upon the record before us, that the trial court abused its discretion when it denied Downey's motion for a mistrial. Here, the jury heard testimony that an undercover officer was set up in an apartment to buy an ounce of cocaine from Ash, that this transaction was part of a larger undercover drug operation, and that five or six officers were conducting surveillance across the street, waiting for the undercover officer's signal that the buy was complete. The jury also heard testimony from which they were able to reasonably deduce that Downey was the person standing beside Ash's vehicle in the parking lot of the apartment building while the drug buy was taking place. Thus, the jury could reasonably have inferred from these facts, supported by the record, that Downey was present at a large drug deal.[3] *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789 (fact-finder may draw reasonable inferences from basic facts to ultimate facts); *Clayton*, 235 S.W.3d at 778 (same). This suggests that any prejudicial effect of the prosecutor's remarks was minor, and it weighs against a mistrial. *See Archie*, 340 S.W.3d at 738–39.

The trial court also immediately instructed the jury to disregard the argument, and the State complied. This, too, weighs against mistrial. *See id.* Moreover, the State's argument was not the sort of "emotionally inflammatory"

---

[3] Although Downey interprets the State's argument to suggest that he was actually *involved* in the narcotics transaction, the record does not support such an interpretation.

16

comment that could not be cured by the court's prompt instruction to disregard. *See id.* at 739.

Downey argues that the evidence against him is so weak that the State's suggestion that he was involved in dealing narcotics "could have carried the ball over the goal line." However, we cannot say that the balance of factors in this case weighs in favor of mistrial, nor can we say that the State's comment was so emotionally inflammatory that curative instructions were not likely to prevent the jury from being unfairly prejudiced against the defendant. *See id.* at 738–39.

We overrule Downey's third point of error.

## Conclusion

We affirm the trial court's judgment.


Jim Sharp
Justice

Panel consists of Justices Keyes, Bland, and Sharp.

Do not publish.   TEX. R. APP. P. 47.2(b).

17